## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

### AMENDED FORM

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 15 2021

CLERK, U.S. DISTRICT COURT
By_____
Deputy

Jay Edward Glenewinkel #56817-280
Plaintiff's Name and ID Number

FCI - Seagoville
Place of Confinement

CASE NO. 3:21-cv-02524-E-BT
(Clerk will assign the number)

v.

M. D. Carvajal - Director of BOP: 320 1st ST NW, Washington, DC 20534
Defendant's Name and Address

J. D. Allen - Medical Director of BOP: 320 1st ST NW, Washington DC 20534
Defendant's Name and Address

K. Zook - Warden, FCI Seagoville, 2113 N Hwy 175, Seagoville, TX 75159
Defendant's Name and Address
( DO NOT USE "ET AL.")  SEE ATTACHED PAGE FOR ADDITIONAL DEFENDANTS

### INSTRUCTIONS - READ CAREFULLY

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form.**

1.  To start an action you must file an original and one copy of your complaint with the court. You should keep a copy of the complaint for your own records.

2.  Your complaint must be legibly handwritten, in ink, or typewritten. You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct. If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACK SIDE OF ANY PAGE.** ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.  You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure. Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.  When these forms are completed, mail the original and one copy to the clerk of the United States district court for the appropriate district of Texas in the division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred. If you are confined in the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID), the list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate district court, the division and an address list of the divisional clerks.

**FILING FEE AND *IN FORMA PAUPERIS* (IFP)**

1. In order for your complaint to be filed, it must be accompanied by the statutory filing fee of $350.00 plus an administrative fee of $50.00 for a total fee of **$400.00**.

2. If you do not have the necessary funds to pay the fee in full at this time, you may request permission to proceed *in forma pauperis*. In this event you must complete the application to proceed *in forma pauperis*, setting forth information to establish your inability to prepay the fees and costs or give security therefor. You must also include a current six-month history of your inmate trust account. If you are an inmate in TDCJ-CID, you can acquire the application to proceed *in forma pauperis* and the certificate of inmate trust account, also known as *in forma pauperis* data sheet, from the law library at your prison unit.

3. The Prison Litigation Reform Act of 1995 (PLRA) provides "... if a prisoner brings a civil action or files an appeal *in forma pauperis,* the prisoner shall be required to pay the full amount of a filing fee." *See* 28 U.S.C. § 1915. Thus, the court is required to assess and, when funds exist, collect, the entire filing fee or an initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis*, the court will apply 28 U.S.C. § 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from your inmate trust account, until the entire $350.00 statutory filing fee has been paid. (The $50.00 administrative fee does not apply to cases proceeding *in forma pauperis*.)

4. If you intend to seek *in forma pauperis* status, do not send your complaint without an application to proceed *in forma pauperis* and the certificate of inmate trust account. Complete all essential paperwork before submitting it to the court.

**CHANGE OF ADDRESS**

It is your responsibility to inform the court of any change of address and its effective date. Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion for any other relief. Failure to file a NOTICE TO THE COURT OF CHANGE OF ADDRESS may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I.  PREVIOUS LAWSUITS:

   A.  Have you filed *any* other lawsuit in state or federal court relating to your imprisonment? ✓ YES ___NO

   B.  If your answer to "A" is "yes," describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, giving the same information.)

   1.  Approximate date of filing lawsuit: **August 17, 2020**

   2.  Parties to previous lawsuit:

   Plaintiff(s) **Jay E. Glenewinkel, Timothy J. Benz, Ryan Offineer, Brian Mattes**

   Defendant(s) **M.D. Carvajal, J.D. Allen, K. Zook, M Bayless, L. Smith, A. Jenkins**

   3.  Court: (If federal, name the district; if state, name the county.) **Northern District, Dallas**

   4.  Cause number: **3:20-cv-2256-B**

   5.  Name of judge to whom case was assigned: **Judge Boyle**

   6.  Disposition: (Was the case dismissed, appealed, still pending?) **Still Pending**

   7.  Approximate date of disposition: **Pending**

2

II.    PLACE OF PRESENT CONFINEMENT: FCI Seagoville

III.   EXHAUSTION OF GRIEVANCE PROCEDURES:

Have you exhausted all steps of the institutional grievance procedure?          ✓ YES ___NO

Attach a copy of your final step of the grievance procedure with the response supplied by the institution.

IV.    PARTIES TO THIS SUIT:

A. Name and address of plaintiff: Jay E. Glenewinkel, PO Box 9000, Seagoville, Texas 75159

B. Full name of each defendant, his official position, his place of employment, and his full mailing address.

Defendant #1: M.D. Carvajal - Director of Bureau of Prisons
             320 1st ST NW, Washington, DC 20534

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

M.D. Carvajal is the current Director of the Bureau of Prisons and is in charge of and responsible for the safety and care of all inmates, as well as staff. -->

Defendant #2: J.D. Allen - Medical Director of Bureau of Prisons
             320 1st ST nw, Washington DC 20534

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

J.D. Allen is the current medical director for the BOP and is in charge for the health care of inmates as well as overseeing medical staff to insure they are -->

Defendant #3: K. Zook - Warden, FCI Seagoville
             2113 N Hwy 175, Seagoville, Texas 75159

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

K. Zook is the current Warden at FCI Seagoville and is responsible for the care of all inmates as well as the actions of staff, including medical.

Defendant #4: D. Bibbs - Medical Administrator, FCI Seagoville
             2113 N Hwy 175, Seagoville, Texas 75159

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

D. Bibbs is the current Med Admin at Seagoville and succeeds B. Grimm in this capacity and is responsible for the competent care of the inmates; Ms. Grimm -->

Defendant #5: K. Bandas - Nurse Practioner, FCI Seagoville
             2113 N. Hwy 175, Seagoville, Texas 75159

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

K. Bandas is a current Nurse Practioner at Seagoville and was responsible for the incompetent handling of the Plaintiff and dealing with his infected toe that -->

3

V.     STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved. Describe how each defendant is involved. You need not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra pages if necessary, but remember the complaint must be stated briefly and concisely. IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

In July 2020, while also dealing with a broken hand and later COVID19, plaintiff had developed an infection on his Right Big Toe. The facility was on COVID lockdown then, so despite several complaints made to various staff, Plaintiff did not receive any form of medical care.for the infected toe from around July 6, 2020 through late-- August 2020. By then, the infection was much worse, bleeding and causing pain. K. Bandas improperly diagnosed the infection as a simple calouse and did not provide the adequate medical needed to prevent further infection. Plaintiff should have been set to the hospital much sooner, but the delay in admission due to incompetent care did result in a partial amputation of the toe that had been infected since early July. Plaintiff had endured pain due the infected toe while also suffering pain from an ->

VI.    RELIEF:

State briefly exactly what you want the court to do for you.  Make no legal arguments. Cite no cases or statutes.

Plaintiff seeks Compensatory Damages in the amount of $843,725.00 AND Punitive Damages in the amount of $275,000.00 for deliberate indifference to the Plaintiffs serious medical care needs and for the uneeded infliction of pain due to incomptent medical

VII.   GENERAL BACKGROUND INFORMATION:

A.  State, in complete form, all names you have ever used or been known by including any and all aliases.
Jay E. Glenewinkel, Jay Glenwinkel, Jay E. Glenwinkel

B.  List all TDCJ-CID identification numbers you have ever been assigned and all other state or federal prison or FBI numbers ever assigned to you.
TDCJ # 706296, BOP #56817-280

VIII.  SANCTIONS:

A.  Have you been sanctioned by any court as a result of any lawsuit you have filed?    ____YES  ✓NO

B.  If your answer is "yes," give the following  information for every lawsuit in which sanctions  were imposed. (If more than one, use another piece of paper and answer the same questions.)

   1.  Court that imposed sanctions (if federal, give the district and division): N/A

   2.  Case number:  N/A

   3.  Approximate date sanctions were imposed:  N/A

   4.  Have the sanctions been lifted or otherwise satisfied?                    ____YES ____NO

4

C. Has any court ever warned or notified you that sanctions could be imposed?    ✓ YES ___ NO

D. If your answer is "yes," give the following information for every lawsuit in which a warning was issued. (If more than one, use another piece of paper and answer the same questions.)

   1. Court that issued warning (if federal, give the district and division): **Northern District of TX**

   2. Case number: **3:21-cv-2524-E-BT (this case)**

   3. Approximate date warning was issued: **October 2021**

Executed on: **November 10, 2021**
          DATE

**Jay E. Glenewinkel** _____

_____
(Signature of Plaintiff)

## PLAINTIFF'S DECLARATIONS

1. I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.
2. I understand, if I am released or transferred, it is my responsibility to keep the court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.
3. I understand I must exhaust all available administrative remedies prior to filing this lawsuit.
4. I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions or appeals (from a judgment in a civil action) in a court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.
5. I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire filing fee and costs assessed by the court, which shall be deducted in accordance with the law from my inmate trust account by my custodian until the filing fee is paid.

Signed this _____ **10th** _____ day of _____ **November** _____, 20 **21** _____.
          (Day)                    (month)                  (year)

**Jay E. Glenewinkel** _____

_____
(Signature of Plaintiff)

**WARNING: Plaintiff is advised any false or deliberately misleading information provided in response to the above questions may result in the imposition of sanctions. The sanctions the court may impose include, but are not limited to, monetary sanctions and the dismissal of this action with prejudice.**

5

Case # 3:21-cv-2524-E-BT
Additional Information

Defendant's Name and Address:

D. Bibbs - Medical Administrator, FCI Seagoville, 2113 N. HWY 175, Seagoville, ';
                                          Texas 75159

K. Bandas _ Nurse Practioner, FCI Seagoville, 2113 N Hwy 175, Seagoville, Texas 75159

Exhaustion of Grievance Procedures:

Please see original Complaint filed for full details of Plaintiff's filing of
Grievances and Staff members efforts to thwart the filing of these remedies.

Defendant's Name and Official Position:

1.  (M.D. Carvajal) It is the Director's responsiblity to ensure that all staff
    under his employ are fulfilling their duties with competence accordingly with
    policy and the rights under the U.S. Constitution for each inmate. The lack
    of medical care and the deliberate indifference of the medical needs of the
    Plaintiff that resulted in loss of a valuable body part comes under the direct
    responsibilty of the Director, and is therefore, also responsible for the lack
    of medical care and subsequent deliberate indifference to the Plaintiff's
    medical needs.

2.  (J.D. Allen) It is the responsiblity of the Medical Director to ensure that
    his medical staff provide prompt, effective and competent medical care and to
    address the serious medical needs of the inmates when the need arises. The lack
    of medical care and the deliberate indifference of the medical needs of the
    Plaintiff that resulted in the loss of a valuable body part comes under the
    direct responsibilty of the medical Director, which also makes him respons-
    ible for the deliberate indifference at the hands of his medical Staff.

3.  (K. Zook) It is the Warden's responsibility to make sure that all of the inmates
    incarcerated at the facility in which she is in charge of receive adequate and
    competent medical care, and that her staff, including medical staff perform
    their duties accordlingly. The fact that Plaintiff DID make verbal complaints
    DIRECTLT to the Warden herself on at least one occasion in regard to the infect-
    ed toe, and still no action was taken at the time, puts her directly responsible
    for the lack of medical care and subsequent deliberate indifference that did
    result in the loss of a valuable body part.

4.  (D. Bibbs) Succeeded Ms. B. Grimm in the role of Medical Administrator at FCI
    Seagoville, who outright acted with incompetence and deliberate indifference
    in regard to Plaintiff's immediate and serious medical needs when she, herself,
    evaluated the wound several times, knowing the infection was worsening, but
    still failed to have Plaintiff admitted to a hospital in a timely manner that
    would have prevented the subsequent amputation of the big toe. Through Grimm,
    Mr. D. Bibbs is therefore responsible for these actions in this capacity.

1

Casde # 3:21-cv-2524-E-BT
Additional Information (continued)

5.     (K. Bandas) Was and IS the Nurse Practioner in charge of the direct medical
       care for the Plaintiff. During the routine (at the time, in July 2020) temp-
       erature checks for COVID19, verbal complaints were made directly to Ms. Bandas.
       Still, it was not until late August 2020 that Plaintiff was finally seen by
       the same Ms. Bandas who indicated that the infected bleeding wound was not as
       serious as it actually was. Through deliberate indifference, minimal care was
       given to the infected wound, causing about a full-month delay in admission to
       a hospital, where subsequently the toe was amputated.

Had proper care been given, had medical staff seen the Plaintiff when complaints
were first made, and had treatment been given that was competent, then Plaintiff
would not have had the toe amputated, losing a very valuable part of his body that
will now forever effect his quality of life.

Please review the initial complaint filed in this cause for a more detailed descript-
ion of events that occured in this matter.

**Statement of Claim:**

improperly healing broken hand as well as being infected with COVID19 (the first
time). In all areas, medical care, at first, failed to even see Plaintiff about the
infected toe, when complaints were first made. Then, when Plaintiff DID see medical,
the care he got was sub-par, and deliberate indifference toward the seriousness of
the infected toe was evident in the lack of care and the extreme delay in sending
the Plaintiff to the hospital, where a Doctor indicated that had Plaintiff been sent
at least two to three weeks early, most likely, the toe could have been saved.

Please review the original complaint filed in this cause.

2

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: APRIL 23, 2021

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : JAY EDWARD GLENEWINKEL, 56817-280
      SEAGOVILLE FCI     UNT: C     QTR: C02-542L
      2113 NORTH HWY 175
      SEAGOVILLE,  TX 75159


FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID       : 1071943-A1      CENTRAL OFFICE APPEAL
DATE RECEIVED   : APRIL 2, 2021
SUBJECT 1       : MEDICAL CARE - IMPROPER OR INADEQUATE
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE
                 WRONG LEVEL.  YOU SHOULD HAVE FILED AT THE
                 INSTITUTION,
                 OFFICE LEVEL.

REJECT REASON 2: CONCUR WITH RATIONALE OF REGIONAL OFFICE AND/OR INSTITUTION
                 FOR REJECTION. FOLLOW DIRECTIONS PROVIDED ON PRIOR REJECTION
                 NOTICES.

REJECT REASON 3: SEE REMARKS.

REMARKS         : NO RECORD OF YOUR FILING A BP-9 AT YOUR INSTITUTION.
                  GET HELP FROM UNIT TEAM.

RECEIVED
WARDEN'S OFFICE

MAY 0 4 2021

FCI SEAGOVILLE

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

RE: Regional Appeal #1071943-R1

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: GLENEWINKEL, JAY, E     56817-280     C7     FCI-Seagoville

      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A - REASON FOR APPEAL**    In July 2020, I developed an infection on my right big toe while I was infected with COVID-19. I am also diabetic with nerve damage and other health issues. During temperature checks, I verbally informed medical staff of the infection and that I was concerned because I have diabeties. Due to the pandemic, I was refused ANY medical care. The infection only got worse. From mid-July through August 22nd, 2020 I was denied any form of medical care, aside from receiving my daily insulin. On August 23rd, 2020 I finally saw medical and was seen by Ms. Bandais. After a quick look at the now bleeding open wound, she indicated that it was ONLY a calous on the toe. I was given a basic antibiotic, but the mdeication was ineffective, and the infection on my toe only got worse. A few days later, I was seen by Mrs. Grimm who started a saline treatment and ordered an x-ray on the foot. But I never received any direct treatment on the toe itself. The infection was still getting worse. On September 25th, 2020 I demanded to be seen by a real doctor, who took a look at the wound and ordered that I be sent to the hospital right away that same day. I was admitted to Dallas Regional Hospital on the evening of September 25th, 2020. Xrays, MRI's and other testing commenced. At 7:30am on September 30th, 2020, half of the right big toe was amputated because the infection had grown into the bone. This has permantently altered by quality of life and how I walk. Had I received proper medical care, this could have been prevented. CONTINUED >>

DATE   MARCH 24, 2021       SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

APR 02 2021

Administrative Remedy Section
Federal Bureau of Prisons

DATE

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: 1071943-A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

DATE       SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

**Central Office Administrative Remedy Appeal, BP11
Continued**

While at the hospital, during a routine consultation, I asked one of the doctors who was involved with the surgery, "if I had been brought in to the hospital a few weeks earlier, could the toe have been saved?" The response I got from the doctor was, "Most Likely."

Health Services Staff at FCI-Seagoville is incompetent and incompassionate towards the health of the inmates it is supposed to care for. They fail to properly diagnos wounds and infection, such as mine, which only leads to more serious health concerns in the future, as has happened to me. Medical staff needs more thorough and better training in handling infections and illnesses among diabetics, especially those who were recently infected with the COVID-19 (I was infected twice).

I have filed a Tort Claim in this action and I will be seeking improved health care for all inmates at Seagoville, and possibly the entire Bureau of Prisons. Overall medical care needs improvement and more competent medical staff employed.

A copy of this ADMINISTRATIVE REMEDY APPEAL has been sent to my attornies, Senators Ted Cruz and John Cornyn, as well as the Office of the Inspector General and the President of the United States.

_March 24, 2021_
Date

_[signature]_
Signature of Requester

**U.S. Department of Justice**

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball–point pen. If attachments are needed, submit four copies. One copy of the completed BP–DIR–9 including any attachments must be submitted with this appeal.

From: Glenewinkel Jay E    56817-280    C7    FCI-Seagoville
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A—REASON FOR APPEAL**

In July 2020 I developed an infection on my right big toe while infected with Covid-19. I verbally informed staff of the infection and that I am diabetic. Due to the Pandemic I was refused any medical care. The infection got worse and from mid-July through August 22, 2020 I was denied medical help. On August 23, 2020 I finally was seen by H.S. Bandas who stated that I only had a calous on the toe. I was given an anti-biotic but it was ineffective and the infection still got worse. A saline treatment commenced and X-rays taken, but I never received any actual treatment to the infection itself, which still got even worse. On September 25, 2020 I finally saw a real doctor who sent me to the hospital the same day. On September 30, 2020, that right big toe was partially amputated and has permanently altered how I walk and my quality of life. This could have been prevented.

Health services staff is incompetent and incapable of making a proper diagnosis and assessments in situations such as mine. Medical staff needs better and more thorough training in handling infections and illnesses among diabetics. Overall medical care needs improvement and more competent staff employed.

A copy of this form has been submitted to my attornies, senators and OIG.

February 17, 2021
DATE

_____ SIGNATURE OF REQUESTER

**Part B—RESPONSE**

RECEIVED
MAR 01 2021
BUREAU OF PRISONS
LEGAL DEPARTMENT, SCRO

_____ DATE

_____ REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE    CASE NUMBER: 1071943 R

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

BP

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Glenewinkel, Jay, E     56817-280     C7     FCI-Seagoville
        LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST**

In July 2020 I developed an infection on my right big toe. Staff was verbally informed, but due to covid, I was refused medical care. The infection got worse. I finally saw medical on August 23, 2020, but H.S. Bandas stated I only had a callous. Antibiotics were given, but were ineffective against the spread of infection. During a visit, Dr. Ratliff refused to even look at the toe. Two weeks later, a semi-daily (not weekends) saline treatment commenced, x-rays were taken, but there was never any actual treatment given to the infection itself. The infection still got worse, and still no direct care. On September 25, 2020 I finally saw a real doctor who sent me to the hospital that same day. Six days after the infected toe was partially amputated, diminishing my health and well-being.

I am seeking punitive damages for medical indifference. I am also seeking better medical care for inmates with serious medical issues as well as better training for Public Health Services staff.

A copy of this complaint has been sent to my attornies, the OIG, Senators and the President of the United States.

December 23, 2020
DATE

SIGNATURE OF REQUESTER

**Part B- RESPONSE**

RECEIVED

MAR 0 1 2021

BUREAU OF PRISONS
LEGAL DEPARTMENT, SCRO

_____ DATE            WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE        CASE NUMBER: _____

                                           CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
         LAST NAME, FIRST, MIDDLE INITIAL

Federal Correctional Institution
Seagoville, Texas

Administrative Remedy Procedures for Inmates
Informal Resolution Form

Bureau of Prisons Program Statement 1330.18, Administrative Remedy Program, requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal written complaint. This form will be used to documen your efforts toward informally resolving your grievance. Complete items 1-3 and return to your Correctional Counsel

INMATE'S COMPLAINT:

State your specific complaint: In July I developed an infection on my right Big toe. I made verbal complaints to staff with no results. The infection got worse and on 8-23-2020 I finally saw medical he confirmed I had a medical issue. A saline treatment daily ensued, xrays were taken, but medical still failed to properly treat the infection by getting me to the hospital to try to save the toe. On 9-25-2020, I finally went to hospital, but the infection was deep resulting in partial amputation of that same toe. Had I been sent to hospital a few weeks sooner, the toe could have been saved. I am now at further risk of suffering more serious health issues.

State what efforts you have made to informally resolve your complaint: I saw medical daily, kept the wound clean and dry and followed staffs instructions in treating the infection. But the infection still got worse, and more should have been done to protect my health against a spreading infection.

State what resolution you request: I am seeking compensation for damages. I also request that BOP HEALTH SERVICES be better trained in treating medical situations and that quicker assessments and care be administered in serious situations in a more timely manner. A copy of this complaint has been sent to my attornies, the OIG, Senators and President.

Jerry Glenewinkel                 56817-280                 C7
Inmate Name                       Register Number           Unit

[signature]                       December 23, 2020
Inmate Signature                  Date

CORRECTIONAL COUNSELOR:

Efforts made to informally resolve and staff contacted: _____

No Informal Resolution - Issued BP-9 on _____ (Date)

Informally Resolved on _____                 _____
                              Date                              Inmate Signature

Counselor's Signature: _____    Date: _____

Unit Manager Review: _____    Date: _____

RULINCS  56817280 - GLENEWINKEL, JAY EDWARD - Unit: SEA-C-A

---------------------------------------------------------------------------

ROM: 56817280
O: Warden
UBJECT: ***Request to Staff*** GLENEWINKEL, JAY, Reg# 56817280, SEA-C-A
ATE: 11/30/2020 09:12:03 AM

): Warden
mate Work Assignment: T-Orderly 7

iis is a request for compassionate release as it pertains to the conditions at Seagoville in the midst of the COVID-19 ndemic. This facility is not equipped and lack of staff and medical care prevents adequate mitigation of another spread of the rona virus. More than 1300 inmates were intentionally infected with the virus in July/August, and without proper testing of .ch inmate to determine if they did indeed recover. Instead, staff relied on CDC information that was widely criticized and later voked, as it was deemed a dangerous means to determine actual recovery.

ave numerous medical conditions. I am diabetic, I have hypertension, nerve damage in arms, legs and neck, advanced uropathy, thyroid disease among other ailments.

July 2020 I developed an infection on my right big toe, but because of COVID and lack of medical care, I was not able to see dical to get the infection treated. The infection got worse, and COVID prevented healing of the infection. When I finally did a medical, they were very slow and inadequate in treating the wound and providing proper attention to the infection. This ludes sending me to the hospital earlier than they did. As a result, my right big toe was amputated, causing other medical ues I now have to contend with, as well as reducing my quality of life. THIS COULD HAVE BEEN PREVENTED AND MY 'E COULD HAVE BEEN SAVED.

agoville FCI is not capable of providing proper care of inmates in this ongoing pandemic. Immunity does NOT mean cure, j the anti-bodies of the corona virus still remains within our systems. There is no means of social distancing, chemical itinue to be extremely diluted making sanitation efforts useless. Meals lack adequate nutrition and lack of temperate control in the housing units will only result in more people getting sick with the corona virus, among other issues. These conditions Seagoville jeopardize the safety and health of the inmate population, which continues to remain overcrowded.

ive had the corona virus twice and I fear a third round. I meet the CDC requirements of at High Risk of contracting the virus; Risk Pattern Assessment is at a minimum level. I need to meet with my own doctors so that I may receive real medical care :ead of the indifference displayed by staff here.

ink you.

**☩ Dallas Regional Medical Center**

DRTX CASE MANAGEMENT Glenewinkel, Jay
1011 N Galloway Ave
Mesquite TX 75149

MRN: 107618243, DOB: 2/20/1970, Sex: M
Adm: 9/25/2020, D/C: —

---

**Consults by Justin Wade, DPM at 9/27/2020 9:15 AM**

| | | |
|---|---|---|
| Author  Justin Wade, DPM | Service: Surgery | Author Type: Physician |
| Filed: 9/27/2020 9:29 AM | Date of Service: 9/27/2020 9:15 AM | Status  Signed |
| Editor  Justin Wade, DPM (Physician) | | |

## Dr WADE INPATIENT CONSULT - PODIATRY

**Name:** Jay Glenewinkel
**DOB:** 2/20/1970

**MRN:** 107618243
**Age:** 50 y.o.

FCI Seagoville
#56817-280

**Date of Consult:** 9/27/2020
**Consulting Provider:** Justin Wade, DPM
**Referring Physician:**

**Reason For Consult:** ulcer
**Requesting Physician:** Dr. Merkin
**Chief Complaint:**
Chief Complaint
Patient presents with

- Toe Pain

**History of Present Illness**

Jay Glenewinkel is a 50 y.o. male with ulcer of the right hallux since August.  He states that it has not been improving and has been looking infected.  He has had two negative x-rays and vascular testing showing good flow to the foot.

**Past Medical History:**
Past Medical History:

| Diagnosis | Date |
|---|---|
| Carpal tunnel syndrome | |
| Diabetes mellitus (CMS/HCC) | |
| Hypertension | |
| Nerve damage | |
| Neuropathy | |

**Past Surgical History:**
Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| MANDIBLE FRACTURE SURGERY | | |

**Allergies:**
Cymbalta [duloxetine hcl]

**Social History:**
Social History

Tobacco Use

---

Generated on 9/28/20 7:54 AM

**Dallas Regional Medical Center**

DRTX CASE MANAGEMENT Glenewinkel, Jay
1011 N Galloway Ave
Mesquite TX 75149

MRN: 107618243, DOB: 2/20/1970, Sex: M
Adm: 9/25/2020, D/C: —

---

**Brief Op Note by Justin Wade, DPM at 9/30/2020 7:23 AM**

| | | |
|---|---|---|
| Author Justin Wade, DPM | Service: Surgery | Author Type: Physician |
| Filed: 9/30/2020 7:44 AM | Date of Service: 9/30/2020 7:23 AM | Status Signed |
| Editor Justin Wade, DPM (Physician) | | |

## RIGHT HALLUX AMPUTATION Procedure Note

Name: Jay Glenewinkel
DOB: 2/20/1970
Sex: male

MRN: 107618243
CSN: 7700042947055
Age: 50 y.o.

FCI Seagoville
#56817-280

**Account Number:**
744000292642

**Date of Procedure:**
9/30/2020

**Preoperative Diagnosis:**
Osteomyelitis right hallux

M86.9

**Procedure(s):**
RIGHT HALLUX AMPUTATION

**Surgeon(s) and Role:**
Justin Wade, DPM - Primary

**Anesthesia Staff:**
Independent CRNA: Amanda F Watts, CRNA

**Anesthesia Type:**
General

**Assistants - If Present**
Circulator: Sandra Hubbard, RN; Vernise Scales, RN

**Specimen Removed**
Right hallux

**Post-op Diagnosis**
same

**Procedure(s):**
RIGHT Partial HALLUX AMPUTATION

**Surgeon(s) and Role:**
Justin Wade, DPM - Primary

---

Generated on 9/30/20 8:25 AM

PATIENT INFORMATION
GLENEWINKEL,JAY

REPORT STATUS    **Final**

Nichols Institute, Chantilly

DOB: 02/20/1970    Age: 50Y
SEX: M

ORDERING PHYSICIAN
RUSSELL,K. MD

CLIENT INFORMATION
1026
FCI - SEAGOVILLE - SEA

SPECIMEN INFORMATION
SPECIMEN:    CH815261M
REQUISITION: 0003478
LAB REF NO:  10260003478

ID: 56817-280
PHONE: 972 2874099

2113 NORTH HWY 175
SEAGOVILLE, TX 75159

COLLECTED:  07/15/2020    13:00
RECEIVED:   07/16/2020    18:57
REPORTED:   07/17/2020    14:27

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | AMD |
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | |
| SARS CoV 2 RNA | | Detected | Not Detected | |

A Detected result is considered a positive test result
for COVID-19. This indicates that RNA from SARS-CoV-2
(formerly 2019-nCoV) was detected, and the patient is
infected with the virus and presumed to be contagious.
If requested by public health authority, specimen will
be sent for additional testing.
CRITICAL VALUE REPORT

Please review the "Fact Sheets" and FDA authorized
labeling available for health care providers and
patients using the following websites:
https://www.questdiagnostics.com/home/Covid-19/HCP/
QuestIVD/fact-sheet.html
https://www.questdiagnostics.com/home/Covid-19/
Patients/QuestIVD/fact-sheet.html

This test has been authorized by the FDA under an
Emergency Use Authorization (EUA) for use by authorized
laboratories.

Due to the current public health emergency, Quest
Diagnostics is receiving a high volume of samples from
a wide variety of swabs and media for COVID-19 testing.
In order to serve patients during this public health
crisis, samples from appropriate clinical sources are
being tested. Negative test results derived from
specimens received in non-commercially manufactured
viral collection and transport media, or in media and
sample collection kits not yet authorized by FDA for
COVID-19 testing should be cautiously evaluated and
the patient potentially subjected to extra precautions
such as additional clinical monitoring, including
collection of an additional specimen.

Methodology:  Nucleic Acid Amplification Test (NAAT)
includes PCR or TMA

Additional information about COVID-19 can be found at
the Quest Diagnostics website:
www.QuestDiagnostics.com/Covid19

GLENEWINKEL,JAY - CH815261M

Page 1 - Continued on Page 2

Report Status: Final

GLENEWINKLE, JAY

 **Quest** Diagnostics™

| Patient Information | Specimen Information | Client Information |
|---|---|---|
| **GLENEWINKLE, JAY**<br><br>DOB: 02/20/1970    AGE: 50<br>Gender:    M<br>Phone:    972.287.4099<br>Patient ID: 56817-280<br>Health ID: 8573025726747998 | Specimen:    DL307434D<br>Requisition: 0007272<br><br>Collected:    11/06/2020 / 08:00 CST<br>Received:    11/07/2020 / 18:18 CST<br>Reported:    11/12/2020 / 13:11 CST | Client #: 33826    ·    IR21MAIL<br>KETURAH BANDAS, FNP-C<br>FEDERAL CORRECTIONAL INST<br>2113 N HIGHWAY 175<br>SEAGOVILLE, TX 75159-2237 |

### SARS CoV 2 (COVID 19) Tests

| Test Name | Result | Reference Range | Lab |
|---|---|---|---|
| SARS CoV 2 RNA(COVID 19)  QUALITATIVE NAAT | | | P93 |
| **SARS CoV 2 RNA** | **Detected** | Not Detected | |

A Detected result is considered a positive test result for COVID-19. This indicates that RNA from SARS-CoV-2 (formerly 2019-nCoV) was detected, and the patient is infected with the virus and presumed to be contagious. If requested by public health authority, specimen will be sent for additional testing. Due to the current public health emergency, Sonora Quest Laboratories is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing, should be cautiously evaluated and the patient potentially subjected to extra precautions, such as additional clinical monitoring, including collection of an additional specimen.

Modifications of this Emergency Use Authorization (EUA) assay have been validated and the analytic performance characteristics have been determined by authorized laboratories.

Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites:

https://www.fda.gov/media/138760/download

https://www.fda.gov/media/138759/download

Methodology: Real-Time RT-PCR

Additional information about COVID-19 can be found at the Quest Diagnostics website: www.QuestDiagnostics.com/Covid19.

Physician Comments:

PERFORMING SITE:
SONORA QUEST LABORATORIES, 424 SOUTH 56TH STREET, PHOENIX, AZ 85034-2108 Laboratory Director: REGINA VANBUREN,MD, CLIA: 03D0528878

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAY E GLENEWINKEL
Plaintiff

v

M.E. Carvajal - Director of BOP

J.D. Allen - Medical Director-BOPP

K. Zook - Warden FCI Seagoville

B. Bibbs - Medical Admin Seagoville

K. Bandas - Nurse Practioner Seagoville
Defendants

Case No.

_____

COMPLAINT

_____

CCIVIL ACTION PURSUANT TO
BIVENS v SIX UNKNOWN NAMED AGENTS OF THE
FEDERAL BUREAU OF NARCOTICS
403, U.S. 388, 404-05, 91 S. Ct. 1999 (1971)

_____

COMES NOW, JAY E. GLENEWINKEL, Plaintiff, Pro Se and in Pauper, brings forth
this Civil Action for injury and damages and other legal and equitable relief
from Defendants Michael D. Carvajal - Director of the Bureau of Prisons (BOP) in
his individual and professional capacity; Jeffery D. Allen - Medical Director for
the Bureau of Prisons in his individual and professional capacity; K. Zook -
Warden at the Federal Correctional Institution (FCI) at Seagoville in her indiv-
idual and professional capacity; B. Bibbs - Health Care Administrator (Succeeding
B. Grimm) at FCI Seagoville in his individual and professional capacity and; K.
Bandas - Nurse Practioner at FCI Seagoville and: other health care providers at

1

FCI Seagoville (collectively 'Defendants') for violations of Plaintiffs Eighth Amendment rights as protected by the United States Constitution for deliberate indifference and failure to provide necessary medical care to prevent permanent injury and loss of quality of life.

Glenewinkel alleges that prison and health care administrators at FCI Seagoville knowingly and willingly inflicted cruel and unusual punishment which resulted in permanent, life-altering injury through deliberate indifference toward his major medical needs as well as an outright failure to provide proper and adequate medical care in which would have prevented said permanent injury.

Glenewinkel is a layman at law, therefore, he invokes the Excusable Error Analysis of HAINES v KERNER, 404 U.S. 519 (1977), where the United States Supreme Court held that pro se litigants pleadins should be held to a less stringent standard than motions drafted by attornies and will, therefore, be liberally construed.

## JURISDICTION & VENUE

This Court has jurisdiction over this Bivens claim pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under Declatory Judgement Statute U.S.C. § 2201 and; (iii) 42 U.S.C.A. § 1983.

2

## PARTIES

1. Plaintiff Jay E. Glenewinkel is incarcerated at FCI Seagoville, where he sustained injuries that resulted in permanent damage due to Medical Staff's deliberate indifference toward Glenewinkel's serious medical needs.

2. Defendant Michael D. Carvajal is the current Director of the Federal Bureau of Prisons (BOP) and is in charge of and responsible for the care of all federal prisoners as well as all of his staff under his employ at all BOP facilities, including FCI Seagoville.

3. Defendant Jeffery D. Allen is the current Medical Director for the Bureau of Prisons and is in charge of the medical care in which prisoners are to to receive at all BOP facilties.

4. Defendant K. Zook is the current Warden at FCI Seagoville and is in charge of all operations as well as being responsible for the care of the staff prisoners at the Seagoville institution.

5. Mr. D. Bibbs is the successor to Ms. B. Grimm as the Health Care Administrator at FCI Seagoville and is in charge of medical care providers at the institution.

6. K. Bandas is currently the Nurse Practioner at FCI Seagoville and is one of three providers responsible for the health care of hundreds of inmates at the institution. Ms. Bandas was the direct provider for Glenewinkel at the time of his injury and subsequent amputation of his toe.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Between July 7th, 2020 through August 21, 2020, numerous attempts were made to inform Administrative and Medical staff about the ever-worsening infection on Glenewinkel's right big toe. This included verbal, written and electronic communications. Verbal complaints were given during routine temperature checks and pill line distibution. All complaints were ignored. Due to the COVID-19 lockdown, Plaintiff was not able to print or make copies of correspondence.

3

2. On or around November 30th, 2020, after Glenewinkel's return from the hospital and COVID quarantine, Glenewinkel sent an electronic message to Warden Zook requesting compassionate release, that included a complaint about the infected toe and subsequent amputation. (See Exhibit A - Message to Warden Zook) This message was ignored and no response received.

3. On December 23rd, 2020, Glenewinkel submitted an Informal Resolution Form (BP8) to Counselor Guzman in building C7 at FCI Seagoville. Mr. Guzman ignored the complaint and failed to respond.

4. Also on December 23rd, 2020, Glenewinkel submitted a REQUEST FOR ADMINISTRATIVE REMEDY (BP9) to Counselor Guzman to forward to Warden Zook. This complaint was also ignored and Warden Zook failed to respond. (See Exhibit B - BP8 and BP9)

5. On February 17th, 2021, Glenewinkel submitted a REGIONAL ADMINISTRATIVE REMEDY APPEAL (BP10), along with a copy of the Warden ignored BP9. The BOP South Central Regional Office received the BP10 and assigned it case number 1071943-R1 on March 1st, 2021. On March 19th, 2021, this BP10 was rejected on the premise that Glenewinkel did not first attempt an Informal Resolution at the institutional level, even though Glenewinkel submitted evidence to prove otherwise. (See Exhibit C - BP10 and Response)

6. On March 24th, 2021, Glenewinkel filed a CENTRAL OFFICE ADMINISTRATIVE REMEDY APPEAL (BP11) with the BOP offices in Washington DC. This was received on April 2nd, 2021 and assigned case number 1071943-A1. As with Glenewinkel's BP10, on May 4th, 2021, the BOP Central Office rejected the claim on the premise that Glenewinkel should have first filed at the institutional level. (See Exhibit D - BP11 and response)

7. Counselor Guzman's failure to acknowledge Glenewinkel's BP8 and Warden Zook's ignoring the filing of his subsequent BP9 thwarted Glenewinkel's attempts to seek action on his Administrative Remedies requests, though evidence dictates that Glenewinkel did in fact properly follow procedure. Therefore, Glenewinkel

4

did exhaust all Administrative Remedy attempts.

## TORT CLAIM

On February 17th, 2021, Glenewinkel filed a claim for injury and damages in the amount of $2,000,000 (two-million) dollars for the lack of medical care in regard to the infection of his right big toe and the subsequent amputation. This claim was filed pursuant to the Federal Tort Claims Act, Title 28 U.S.C. § 2672. The BOP assigned the claim as number TRT-SCR-2021-03337. The claim was denied on September 7th, 2021 and Glenewinkel was advised that he could file a lawsuit in the federal Court. (See Exhibit E - Tort Claim and Response)

## STATEMENT OF FACTS

1. Several years prior to the outbreak of the global corona virus pandemic in March 2020, Glenewinkel had been diagnosed as having a) Diabeties; b) Neuropathy in both feet; c) Hypertension; d)Nerve damage in both arms and neck; e) Abnormal heart rate; f) Carpal Tunnel syndrom and; other significant health issues. Glenewinkel has been taking insulin and medications for most of these medical issues.

2. On June 25th, 2020, FCI Seagoville was placed on total lockdown due to the start of the COVID-19 outbreak that resulted in more than 1300 prisoners being intentionally infected with the disease. (See GLENEWINKEL et. al. v. CARVAJAL et. al., 3:20-CV-2256-B)

3. On that same day, due to a fall in a stairwell, Glenewinkel sustained a broken hand. X-Rays were taken and the broken hand was placed in a temporary

5

brace. Glenewinkel did NOT recieve any further medical attention, ever, for the broken hand. For more than five weeks after the accident, Glenewjnkel endured extreme pain in the right hand and the hand never did heal properly.

4. On July 1st, 2020, Glenewinkel along with more than fifty (50) - plus other inmates were forced to move from Housing Unit A5 to Housing Unit F10, thus forcing Glenewinkel to pack up all of his personal property and carry it downstairs in one unit, across the compound to the other building, then upstairs in another building, all with a broken hand in the extreme Texas heat.

5. Around July 6th, 2020, a dime-sized blister developed on Glenewinkel's right big toe. Glenewinkel did his best to keep the toe clean and dry, but living conditions in Building F10 at the time were extremely unsanitary and unhealthy, with meals lacking proper nutrition, making attempts at preventing infection to the toe nearly impossible.

6. During the (then) routine COVID temperature checks, on July 8th, 2020, Glenewinkel made verbal complaints to prison staff about the blister that had broken and started bleeding. Staff told Glenewinkel to keep the blister area clean and that things would be alright.

7. By July 11th, 2020, the bleeding was getting worse and a part of the toe had turned to a bluish/purplish color around the wound, with extreme pain and pressure that could be felt in the toe and foot (despite having neuropathy) and simply walking became a painful and difficult task, in addition to still having pain in the broken hand. More complaints were verbalized during the

6

temperature checks and pill/insulin distributions, but still there was absolutely NO medical assistance provided or offered, whatsoever.

8. On July 13th, 2020, more verbal complaints were made to staff during the temperature checks, only to receive the regular indifferent treatment and comments toward his medical needs. On this day, however, Glenewinkel submitted an electronic message to medical staff, as well as a written request, on a plain sheet of paper, complaining of the open wound on the right toe. There was no response to either of these complaints.

9. By July 15th, 2020, the wound on Glenewinkel's toe had grown larger and was still bleeding. A blackened calouse began to cover portions of the wound, but bleeding, swelling and pain persisted, as did the pain in the right hand. More verbal complaints were made, only to receive empty results.

10. On July 17th, 2020, Glenewinkel tested positive (for the first time) for the corona virus. (See Exhibit F - COVID Results) As a result, Glenewinkel was once again required to pack up his property and move to a makeshift housing area established in the chapel's auditorium. This required walking some distance on the wounded toe, still with a broken hand, while having COVID in near 100° degree heat and humidity. Glenewinkel was housed with more than forty (40) other inmates who had also tested positive for COVID-19, with army cots set up as sleeping quarters with less than two (2) feet of spacing between each cot.

7

11. The very next day, July 18th, 2020, building F10 was flipped to become a housing unit for inmates infected with COVID-19. As a result, Glenewinkel had again to move, carrying his property back to building F10 in the heat, with an open, bleeding wound on his right toe, a still broken right hand that was not healing properly, and who was also infected with the corona virus.

12. After the move, when Glenewinkel was able to finally look at the wounded toe again, upon removing his sock and shoe, he discovered that his sock was covered in blood. The calouse had cracked open, allowing for blood and puss to ooze out, while the toe itself was starting to turn from purplish to a deep red. Another written complaint was submitted on plain paper, handed to medical during pill/insulin distribution, as well as a verbal complain made. Staff told Glenewinkel they would call for him, but this never occured. Glenewinkel attempted to treat the wound by cleaning it and wrapping it in bandages.

13. By July 20th, 2020, Glenewinkel was still experiencing pain in his right hand, though the pain had diminished some. The pain on the wounded right toe was still an issue as bleeding continued and swelling increased. However, at this time, Glenewinkel also began experiencing dizzy spells, shortness of breath, fatigue and coughing as a result of being infected with COVID-19. However, Glenewinkel never did have a fever, despite other COVID symtoms.

14. Between July 25th, 2020 and mid-August 2020, Glenewinkel made a few more attempts to get some medical care for the toe, but still no response. At the time, medical was only seeing inmates who had to go to the hospital for COVID-19 related issues.

8

15. Around August 20th, 2020, the COVID lockdown had eased some, so at the morning insuline/pill distribution, a written sick-call request was submitted to medical through the pharmacy technician Ms. Kennemer.

16. On August 23rd, 2020, Glenewinkel was finally seen by Nurse Practioner K. Bandas. At this time, Ms. Bandas determined that the wound was only a calouse and was not a serious medical condition (despite dealing with pain and much swelling for almost 40 days). However, Ms. Bandas did prescribe an anti-biotic, but Glenewinkel suffered an allergic reaction to the medication, and the anti-biotic was not effective any way.

17. A few days later, around or about August 28th or 29th, 2020, Glenewinkel was on a medical call out to to see Mr. Ratliff, another Nurse Practioner at the time. Upon consulting Mr. Ratliff about the wound, Mr. Ratliff adamantly re-fused to even look at the wound. When Glenewinkel informed Mr. Ratliff that he was a dianetic and concerned for the health of his foot, Mr. Ratliff stated, "I don't care, it's not my problem. Go back to your unit." This was a total and complete disregard toward Glenewinkel's health.

18. Around September 4th, 2020, the swelling in the wounded toe increased, the bleeding had started again and the toe was again showing signs of discolor-ization with increased pain. During pill line, Glenewinkel asked Nurse D. Daniels to look at the wound, which she did. Upon seeing the bleeding wound, Nurse Daniels expressed extreme concern and promptly cleaned and dressed the wound. She also put Glenewinkel on a medical call-out for the very next day.

9

19. On or around September 5th, 2020, Glenewinkel was seen by Health Care Administrator B. Grimm and Nurse A. Burke. Ms. Grimm expressed grave concern for the wounded toe, but did little to actually treat it. A treatment of saline rinse and bandage was ordered for three (3) times per week, and X-Rays were taken (X-Rays do NOT show infections), but otherwise NO actual treatment for the wound itself was given.

20. Later that same week, K. Bandas again reviewed the wound and still insisted it was just a calouse, not a major medical concern. The X-Rays showed no sign of infection (though an MRI would have detected the present infection). Still exhibiting indifference, Ms. Bandas did order a new anti-biotic, which was also completely ineffective.

21. From about September 5th, 2020 through September 24th, 2020, Health Care Administrator B. Grimm; Nurse D. Daniels; Nurse A. Burke; Nurse Prationer K. Bandas and other medical staff were well aware of the seriousness of the open wound on the toe, with infection clearly evident, knowing Glenewinkel should have seen a real doctor by then. The saline treatment was topical and did not penetrate below the dead tissue on the toe. The medicated pad was also topical and only applied on ocassion (about three (3) times per week), but did nothing more than soften the dead tissue.

22. From late August 2020 through late September 2020, all of medical's vague attempts at attending the wound were futile and in vain. Each day, the wound continued to bleed, the skin tissue got blacker, swelling and pain increased

10

and infection in the bone developed. During the so-called 'wound care', Glenewinkel expressed that he should probably see a doctor, but Ms. Grimm and Ms. Bandas ignored Glenewinkel's concerns. Still, the infection in the toe deepend and the injury to the toe was very near irreversible.

23. On September 25th, 2020, while receiving the so-called 'wound care', Glenewinkel insisted that he see a 'real' doctor. It happened that Doctor White was on the premises that day and willingly agreed to evauluate the wound. Around 13:00 hours (1:00pm), Doctor White looked at the infected toe and immediately ordered that Glenewinkel be taken to Dallas Regional Hospital, where Glenewinkel was admitted around 18:30 hours (6:30pm).

24. At Dallas Regional Hospital, between September 25th, 2020 and September 29th, 2020, Glenewinkel was placed on an IV drip with anti-biotics, and underwent numerous tests. Several photographs, X-Rays and MRI images were taken of the infected toe. Glenewinkel was consulted several times by Doctor Wade and a few other doctors about the seriousness of the injury and the options that were then available; 1) 8-12 weeks (or longer) of IV anti-biotic treatment that had only a 60% to 70% chance of being effective toward recovery, or; 2) partial amputation of the right big toe with about a 30-day recovery and rehabilitation time-frame.

25. During one of the routine consultations with one of the many doctors involved, Glenewinkel asked, "If I'd been brought in two or three weeks earlier, could you have saved the toe?" The doctor answered by simply stating, "Most Likely."

11

26.  Glenewinkel opted for, and consented to the partial amputation. The prolonged IV anti-biotic treatment was not a guarantee, and if it did not work, then an amputation would be needed anyway, so the partial amputation was agreed to. At 7:30 am on September 30th, 2020, half of the right big toe was removed.

27.  Later in the day on September 30th, 2020, Glenewinkel was transported from Dallas Regional Hospital to Vibra Specialty Hospital for recovery and rehabilitation, where Glenewinkel remained for twenty-four (24) days.

28.  On October 23rd, 2020, Glenewinkel was returned to FCI Seagoville, where he was placed in quarantine as part of the COVID protocol. Nurse D. Daniels administered a COVID test on Glenewinkel that had negative results.

29.  While in quarantine, Glenewinkel began experiencing some pain and discomfort in the region of the toe amputation. this was due, in part, to the effects of the anti-biotics received at the hospital starting to wear off.

30.  On November 6, 2020, while still in quarantine, Glenewinkel was again tested for the corona virus, where, this time, the results turned up positive. For a second time, Glenewinkel was infected with COVID-19, where he was put in isolation immediately. During this time period, there were at least twenty (20) other confirmed cases of inmates that were infected with COVID-19, but some of these were not reported.

31.  While in COVID isolation, Glenewinkel again experienced dizziness, fatigue, coughing and other symptoms associated with the corona virus, while also

12

still enduring pain in the right foot due to the amputation. It should be noted that when Glenewinkel was placed in the isolation cell in Jail Unit 5, the cell had NOT been cleaned or sanitized prior to Glenewinkel entering the cell. The previous occupants, who had just been released, also had the COVID, therefore, it was likely the contaminates of the corona virus were still present upon Glenewinkel's placement in that cell.

During the ten (10) days that Glenewinkel was in that cell for COVID isolation in J5 unit, NOT once was Glenewinkel offered any cleaning or sanitation supplies.

32. On November 23rd, 2020, Glenewinkel was returned to the general population, which was still in partial COVID lockdown.

33. From late November through mid-December 2020, the area of the amputation appeared to be healing, though Glenewinkel was still required to walk in a special medical shoe with crutches, a mandate issued since the amputation in September 2020.

34. Around December 23rd, 2020, a new blister developed on the remaining portion of the amputated toe, and pain and discomfort returned. For several days, medical did not provide any care for the new wound. However, in early January 2021, Ms. Bandas evaluated the wound, again claiming that it was 'just a calouse', and was nothing to worry about. The wound began bleeding again and the levels of pain once again increased. A few days later, Glenewinkel saw Nurse Practioner Osaade, who immediately began a new wound care treatment, using different methods and procedures that were effective in preventing any

13

additional infection from developing in the toe, but the wound, as a result of the initial infection and subsequent amputation, is now non-healing and remains a medical issue to this very day.

35. Since september 30th, 2020, since the amputation of the toe, Glenewinkel has been required to walk using a special medical shoe that forces him to walk unevenly and this is causing pain and stiffness in the lower spine region. Furthermore, as a result of the toe amputation and subsequent new would that has developed, Glenewinkel's mobility has been limited to necessary use only, with no heavy lifting of anything over fifeteen (15) pounds. Glenewinkel can no longer run, will never be able to perform simple functions such as dancing, hiking or most of daily activities that once required applying pressure to the right foot.

36. As of October 5th, 2021, Glenewinkel continues to deal with pain of the non-healing wound on the amputated toe, as well as additional pain in the lower back and spine region. The loss of muscle mass in his arms and legs is also attributed to the limited mobilitiy brought on by the toe amputation, and Glenewinkel fears that atrophy will soon become an issue as well, due to the medical conditions related to the amputation of half of his right big toe on September 30th, 2020.

## DISCUSSION

1) The Eighth Amendment of the United States constitution prohibits the infliction of 'cruel and unusual' punishment on convicted prisoners. Just the same,

14

the Eighth Amendment also protects against conditions that pose an unreasonable risk of future harm, as well as those that are currently causing harm. HELLING V McKINNEY, 509 U.S. 33 (1993).

2. From June 25th, 2020 through about mid-August 2020, there was not any form of medical care available (unless you needed to go to the hospital because of COVID) to the inmate population at FCI Seagoville, due to the institutional outbreak of COVID-19. Basically, any form of non-COVID medical care was non-existent and all medical staff were unavailable with the exception of the few medical staff members that dealt with the COVID issues only.

3. In addition, there was absolutley no unit team personel available to anyone in the inmate population. This means that the inmates did NOT have any way to request any form of help, file administrative remedies, print or make copies of legal papers or medical forms. Nothing was available in the way of medical or other assistance for more than forty (40) days.

4. From June 25th, 2020 through early August, Glenewinkel endured extreme pain in his right hand that had been broken in a fall. Though Glenewinkel did receive some medical care on the day the hand was broken, there was not any form of follow-up medical care, nor was Glenewinkel given any form of medications for the pain. What's more, Glenewinkel was forced to use the broken to pack up personal property and make numerous moves to other housing units which increased the level of pain in the hand and delayed the healing process for that hand. This pain persisted for more than 42 days.

15

5. From June 6th, 2020, Glenewinkel developed a blister on his right big toe that quickly became extremely painful, and eventually became an open, bleeding wound that did not receive any form of medical care for more than 49 days, despite numerous attempts to inform staff and make complaints to officers and medical staff that included (but not limited to), Warden Zook;  Unit Manager Pate; Unit Manager Tavarus; Counselor Thompson; Counselor Guzman; Nurse Practioner K. Bandas;  Health Care Administrator B. Grimm and other medical staff and prison officers. Every attempt was made to notify medical and prison staff of the open wound on the right toe. These efforts included verbal, written, and electronically, but absolutely no medical care was given for the wounded toe.

6. From July 15th, 2020 through at least August 1st, 2020, Glenewinkel was infected with the corona virus, with only moderate symptoms which was also not given any medical treatment by medical.

7. For at least forty (40) days, Glenewinkel endured extreme pain simultaneously:
   a)  In right broken hand (42 days)
   b)  Open wound on right big toe (49 days)
   c) Infected with COVID-19 (first time) (20 days)
   d) All three sources of untreated pain and infection (at least 20 days)

8. Once Glenewinkel was finally able to see medical, the staff ignored the seriousness of the open, bleeding wound which was still causing Glenewinkel pain. The wound, at the time, was topped with multiple layers of black, dead skin tissue, with blood oozing out from the sides of the wound and swelling

16

and redness on the rest of the toe. (once obtained, hospital photographs will verify this description)

9. Medical staff at Seagoville FCI acted with deliberate indifference and failed to provide the porper medical care needed that could have ultimately prevented the need for any amputation to begin with. Simply taking Glenewinkel to the hospital two weeks sooner would have more than likely saved the toe.

10. As a result, the damage caused by the injury to the right toe is permanent, and the loss of this valuable body part has and will forever alter Glenewinkel's quality of life and may very well prevent him from working at a job with GO ZERO, a company in Ohio, that had been secured by Glenewinkel, long before the start of the COVID pandemic.

11. Likewise, since the broken right hand never had a chance to properly heal, though still functional, the damage from an improperly healed broken hand is also permamnent and has also effected Glenewinkel's quality of life.

12. Furthermore, two (2) weeks after returning to the prison after the amputation of the right toe and the remainder of the toe was still healing, Glenewinkel was exposed to and became infected with COVID-19 for a second time, (See Exhibit G - COVID Test Results) and was placed in isolation cells that had not been cleaned or sanitized beforehand and Glenewinkel was denied any form of cleaning supplies for the entire ten (10) days that he was in that cell. These unsanitary conditions put Glenewinkel at risk for further infection to the amputated toe as well as possible continued infection of COVID-19.

17

## DAMAGES

1. Collectively, Glenewinkel endured severe pain in his right hand that had been broken, while seperately but simultaneously enduring severe pain in his right big toe which had an open wound, all while being infected with COVID-19 and all of which was denied any form of medical care for more than forty days. This denial of medical care ultimately resulted in the permanent loss of the right toe and forever altered Glenewinkel's quality of life as well as adding extreme mental stress and anguish to an already stressful situation.

2. Glenewinkel seeks Compensatory and Punitive damages for the violations of his Eighth Amendment Constitutional rights to be free from the infliction of un- necessary and wanton pain and for failure to provide medical treatment for serious medical needswhich resulted in cruel and unusual punishment.

## COMPENSATORY DAMAGES

- $3,150.00   -   $75 per day (42 days) for each day of pain to broken hand without follow-up medical care or medications.

- $8,575.00   -   $175 per day (49 days) for each day of pain and suffer- ing due to failure to provide medical care for open wound on right big toe.

- $5,000   -   $250 per day (20 days) for each day of suffering from COVID-19 combined with pain in the broken hand and the open wound on right toe.

- $8,000   -   $250 per day (32 days) for each day of improper diagnosis and inadequate or improper medical care of infected open wound on right big toe.

- $250,000   -   $250,000 for the permanent loss of the right big toe due to medical deliberate indifference and failure to provide medical care that could have saved toe.

18

COMPENSATORY DAMAGES (continued)

- $1,000   -   $100 per day (10 days) for each day of confinement in COVID-isolation cell without prior cleaning or sanitation of cell and for failing to provide cleaning supplies throughout Glenewinkel's confinement in that cell.

- $468,000   -   $180 per day (3,650 days) of potential lost wages from post release employment already secured with GO ZERO.

- $100,000   -   $100,000 for mental stress and anguish resulting from the loss of big toe and the loss of quality of life.

- $10,000   -   $10,000 or actual sum of all court, attorney and other legal fees incurred in this legal action.

$843,725.00   total compensatory damages

PUNITIVE DAMAGES

- $150,000   -   For violations of Glenewinkel's EIGHTH AMENDMENT Consitutional right, as protected under the U.S. Constitution against cruel and unusual punishment by complete failure to provide treatment to Glenewinkel's serious medical needs that resulted in the unnecessary and wanton infliction of pain. (See ESTELLE v. GAMBLE, 429 U.S. 104 (1976)

- $125,000   -   For the reckless and deliberate indifference by the medical staff and prison staff at FCI Seagoville by 1) failing to provide proper medical treatment of a wound that was obviously a serious injury and; 2) failing to send Glenewinkel to the hospital in a timely manner that could have prevented the need for amputation and long-term future medical care as well as resulting in the permanent loss of a valuable body part.

$275,000   total punitive damages

TOTAL DAMAGES

$843,725.00   Compensatory Damages
$275,000.00   Punitive Damages

$1,118,725.00 TOTAL DAMAGES

19

## CONCLUSION

The damages to Glenewinkel's health and quality of life is permanent and can not be reversed. The medical and administrative staff at FCI Seagoville exhibited complete and total disregard toward his medical needs. Therefore, the named defendants in this Civil Action, each in his or her individual and professional capacities must be held accountable for their actions and the manner presented here in regard to a human's life.

Wherefore, Plaintiff Jay Edward Glenewinkel PRAYS that this Honorable Court GRANT a ruling in his favor and award him the damages that he is entitled to for the permanent injuries sustained due to the medical and prison staff's reckless and deliberate indiference, as stated herein.

Submitted on this **6th** day of **October, 2021**

Respectfully Submitted,

Jay E. Glenewinkel
Plaintiff

## CERTIFICATE OF SERVICE

I, Jay E. Glenewinkel, Plaintiff in the above titled Civil Action hereby declares that pursuant to 28 U.S.C. § 1746, under penalty or perjury, that the foregoing is true and correct and was placed in the prison mailing system for distribution to this Court.

Submitted on this **6th** day of **October, 2021**

Jay E. Glenewinkel
Plaintiff

20

JAY GLENEWINKEL #56817-280
FEDERAL CORRECTIONAL INSTITUTION
PO Box 9000 - C7
Seagoville, TX 75159-9000



DALLAS TX 750
WED 10 NOV 2021

L E G A L   M A I L

UNITED STATES DISTRICT COURT
CLERK OF COURT
1100 COMMERCE STREET - ROOM 1452
DALLAS, TX 75242-1495

RECEIVED - 6

NOV 1 5 2021

MAILROOM

◇◇56817-280◇◇
Jay Glenewinkel
#56817-280
Federal Correctional Complex
P.O. Box 9000 - Unit C7
Seagoville, TX 75159-9000
United States